Gardephe

08 CV 7188

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

ATLAS BULK SHIPPING AS,

Plaintiff,

- against -

CEMENTOS CASTILLA LA MANCHA, S.A.

Defendant.

---------------------------------------------------------------X

**VERIFIED COMPLAINT**

Plaintiff, ATLAS BULK SHIPPING AS (hereinafter "Atlas" or "Plaintiff"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the Defendants, CEMENTOS CASTILLA LA MANCHA, S.A. (hereinafter "Cementos" or "Defendant"), alleges, upon information and belief, as follows:

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the breach of a maritime contract of charter. This matter also arises under the Court's federal question jurisdiction within the meaning of 28 United States § 1331.

2. At all times material to this action, Plaintiff was, and still is, a foreign corporation, or other business entity organized and existing under foreign law with an office and place of business at Sundkaj 11, 2100 Copenhagen, Denmark.

3. Upon information and belief, Defendant was, and still is, a foreign corporation or other business entity organized and existing under foreign law with an office and place of business at Cira, CM 2102 KM. 1, 16440 Montalbo Cuenca, Spain.

4. At all times material to this action, Plaintiff was the disponent owner of the vessel M/V "GEM OF COCHIN" (hereinafter the "Vessel").

5. By a charter party contract dated July 16, 2008, (hereinafter the "Charter Party") Plaintiff chartered the Vessel to Defendant for the carriage of 65,000 metric tons (5% +/-) of cement clinker in bulk from the load ports of Nantong and Zhoushan, China to the discharge ports of Valencia or Cartagena, Spain at a freight rate of $51.50 per metric ton. *A copy of the Charter Party is annexed hereto as Exhibit 1.*

6. Part II Clause 22 of the Charter Party provides:

> 95% of freight to be paid in U.S. Dollars directly into the Owner's bank and account within 5 days from signing and releasing Bills of Lading marked "Freight payable as per Charter Party", and Charterers receiving Owners faxed invoice, on Bills of Lading weight.

*See Exhibit 1 annexed hereto.*

7. Bills of lading were issued on July 25, 2008 and July 27, 2008 and released on August 1, 2008 and, thus, 95% of the freight in the amount of $3,062,386.99 became due and owing to Plaintiff on August 6, 2008.

8. Plaintiff duly issued its Freight Invoice to Defendant in the sum of $3,062,386.99. *See Exhibit 2 annexed hereto.*

9. Subsequently, Defendant issued a message to Plaintiff advising that it would not pay the freight and did not consider itself bound by the terms of the Charter Party contract because it had sold the cement clinker cargo to a third party.

10. At all material times Plaintiff duly and fully performed its duties and obligations under the Charter Party.

11. Defendant's failure to pay Plaintiff the outstanding freight in the amount of $3,062,386.99 constitutes a breach of the Charter Party contract.

12. Plaintiff has suffered damages as a result of the Defendant's breach of the Charter Party contract.

13. Pursuant to Part I Clause 25 and Part II Clause 36 of the Charter Party, all disputes between the parties are to be submitted to arbitration in London with English Law to apply. Plaintiff will commence arbitration once jurisdiction is obtained over Defendant in this action. *See Exhibit 1 annexed hereto.*

14. This action is brought to obtain jurisdiction over the Defendant in aid of the arbitration proceeding to be commenced and to obtain security for Plaintiff's claims.

15. Interest, costs and attorneys' fees are routinely awarded to the prevailing party in proceedings subject to English Law. Section 63 of the English Arbitration Act of 1996 specifically allows for recovery of these items as part of an award in favor of the prevailing party.

16. As best as can now be estimated, Plaintiff expects to recover the following amounts at arbitration as the prevailing party:

| | | |
|---|---|---|
| a. | Principal Claim: | $3,062,386.99 |
| b. | Interest on principal claim for 2 years, compounded quarterly at 8 %: | $ 525,687.75 |
| c. | Estimated arbitration costs: | $ 35,000.00 |
| d. | Estimated recoverable legal fees and costs: | $ 300,000.00 |
| **Total:** | | **$3,923,074.74** |

17. The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees which are believed to be due and owing to the

E. That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

F. That this Court award Plaintiff its attorney's fees and costs of this action; and

G. That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

Dated: August 11, 2008
New York, NY

The Plaintiff,
ATLAS BULK SHIPPING AS

By: ______________________

Patrick F. Lennon
Coleen A. McEvoy
LENNON, MURPHY & LENNON, LLC
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 – phone
(212) 490-6070 – fax
pfl@lenmur.com
cam@lenmur.com

## ATTORNEY'S VERIFICATION

1.    My name is Coleen A. McEvoy.

2.    I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.    I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the

Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.    The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

6.    The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on the Plaintiff's behalf.

Dated:        August 11, 2008
              New York, NY

Coleen A. McEvoy

Defendant. *See Affidavit in Support of Prayer for Maritime Attachment annexed hereto as Exhibit "3"*.

18. The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendant held by the aforesaid garnishee for the purpose of obtaining personal jurisdiction over the Defendant and to secure the Plaintiff's claims as described herein.

**WHEREFORE**, Plaintiff prays:

A. That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint

B. That pursuant to 9 U.S.C. §§ 201. *et seq.* and/or the doctrine of comity this Court recognize and confirm any foreign judgment or arbitration award rendered on the claims had herein as a Judgment of this Court;

C. That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all tangible or intangible property of the Defendant within the District, including but not limited to any funds held by any garnishee, which are due and owing to the Defendant, up to the amount **$3,923,074.74** to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

D. That this Court enter Judgment against Defendant on the claims set forth herein;

E. That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

F. That this Court award Plaintiff its attorney's fees and costs of this action; and

G. That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

Dated: August 12, 2008
New York, NY

The Plaintiff,
ATLAS BULK SHIPPING AS

By: ______________________

Patrick F. Lennon
Coleen A. McEvoy
LENNON, MURPHY & LENNON, LLC
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 – phone
(212) 490-6070 – fax
pfl@lenmur.com
cam@lenmur.com

ATTORNEY'S VERIFICATION

1. My name is Coleen A. McEvoy.

2. I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3. I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the Plaintiff.

4. I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5. The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6. The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7. I am authorized to make this Verification on the Plaintiff's behalf.

Dated: August 12, 2008
New York, NY

________________________
Coleen A. McEvoy

# EXHIBIT 1

RECOMMENDED
THE BALTIC AND INTERNATIONAL MARITIME COUNCIL
UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 AND 1994)
(To be used for trades for which no specially approved form is in force)
CODE NAME: "GENCON" Part I

| | |
|---|---|
| 1. Shipbroker<br>Box Marine Iberica, S. L., Madrid | 2. Place and date<br>Madrid 16th July 2008 |
| 3. Owners/Place of business (Cl. 1)<br>ATLAS BULK SHIPPING A/S<br>11, Sundkaj<br>2100 COPENHAGEN (Denmark) | 4. Charterers/Place of business (Cl. 1)<br>CEMENTOS CASTILLA LA MANCHA, S. A.,<br>MONTALBO (Spain) |
| 5. Vessel's name (Cl. 1)<br>"GEM OF COCHIN" - See Clause 21 | 6. GN/NT (Cl. 1)<br>37319 / 19445 |
| 7. DWT all told on summer load line in metric tons (abt.) (Cl. 1)<br>See Clause 21 | 8. Present position (Cl. 1)<br>Trading |
| 9. Expected ready to load (abt.) (Cl. 1)<br>21st July 2008 -See also Clause 20 | |
| 10. Loading port or place (Cl. 1)<br>One safe berth NANTONG (laden draft 10.20 m. - Max. LOA 230 m. Max. beam 32.20 m. - WLTHC 12 m.), where shall load upto max. draft topping up balance quantity in 2nd loadport ZHOUSHAN, laden draft 14 M. | 11. Discharging port or place (Cl. 1)<br>One safe berth VALENCIA or CARTAGENA (Spain) in Charterer's option - See also Clause 27 |
| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1)<br>65,000 MT 5% MOLOO of CEMENT CLINKER IN BULK<br>(Estimated intake abt. 62,500 / 63,000 MT, estimated intake basis 1st load port abt. 46,800 MT on 10.2 m. FW draft) | |
| 13. Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 4)<br>US$ 51.50 per MT FIOT | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4)<br>See Clause 22 |
| 15. State if vessel's cargo handling gear shall not be used (Cl. 5) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only) (Cl. 6) |
| 17. Shippers/Place of business (Cl. 6) | (a) Laytime for loading<br>See Clause 26 |
| 18. Agents (loading) (Cl. 5)<br>Owners nominate Agents, see also Clause 23 | (b) Laytime for discharging<br>See Clause 27 |
| 19. Agents (discharging) (Cl. 5)<br>Charterers nominate Agents, see also Clause 23 | (c) Total laytime for loading and discharging |
| 20. Demurrage rate and manner payable (loading and discharging) (Cl. 7)<br>See Clause 29 | 21. Cancelling date (Cl. 9)<br>25th July 2008 |
| | 22. General Average to be adjusted at (Cl. 12)<br>English Law, London |
| 23. Freight Tax (state if for the Owners' account (Cl. 13(c))<br>See Clause 35 | 24. Brokerage commission and to whom payable (Cl. 15)<br>1.25% to Box Marine Iberica, S. L., Madrid<br>1.25% London Shipbroking Company Limited |
| 25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c) agreed also state Place of Arbitration) (if not filled in 19(a) shall apply) (Cl. 19)<br>English Law, London, see Clause 36 | |
| (a) State maximum amount for small claims/shortened arbitration (Cl. 19) | 26. Additional clauses covering special provisions, if agreed<br>Clauses 20-45 as attached are deemed fully incorporated in this C/P. |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| | |
|---|---|
| Signature (Owners) | Signature (Charterers) |

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen

Printed and sold by Witherby & Company Limited, 32/36 Aylesbury Street, London EC1R 0ET. Tel No. 0171 251 5341 Fax No. 0171 251 1296 by authority of The Baltic and International Maritime Council (BIMCO), Copenhagen

COPY

# PART II

## "Gencon" Charter (As Revised 1922, 1976 and 1994)

1. It is agreed between the party mentioned in Box 3 as the Owners or time/voyage chartered Owners of the vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now trading in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that:
The said Vessel shall, ~~as soon as her prior commitments have been completed,~~ proceed to the loading port(s) or place(s) stated in Box 10 where ~~or so near thereto as she may safely get and lie always afloat,~~ and there load a full and complete cargo ~~(if shipment of deck cargo agreed same to be at the Charterers' risk and responsibility)~~ as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or place(s) stated in Box 11 as ordered on signing Bills of Lading, ~~or so near thereto as she may safely get and lie always afloat,~~ and there deliver the cargo.

2. Owners' Responsibility Clause
The Owners are to be responsible for the loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager.
And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, ~~or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.~~

3. Deviation Clause
The Vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property.

4. Payment of Freight
~~(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.~~
~~(b) Prepaid. If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non-returnable, Vessel and/or cargo lost or not lost.~~
~~Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actually been paid.~~
~~(c) On delivery. If according to Box 13 freight, or part thereof, is payable at destination it shall not be deemed earned until the cargo is thus delivered. Notwithstanding the provisions under (a), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before breaking bulk and the weight/quantity can be ascertained by official weighing machine, joint draft survey or tally.~~
~~Cash for Vessel's ordinary disbursements at the port of loading to be advanced by the Charterers, if required, at highest current rate of exchange, subject to two (2) per cent to cover insurance and other expenses.~~

See Clauses 22

5. Loading/Discharging
(a) Costs/Risks
The cargo shall be brought into the holds, loaded, stowed and/or trimmed, ~~tallied, lashed and/or secured~~ and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. ~~The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed.~~
~~(b) Cargo Handling Gear~~
~~Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of the stevedores, time lost by breakdown of the Vessel's cargo handling gear or motive power - pro rata the total number of cranes/winches required at that time for the loading/discharging of cargo under this Charter Party - shall not count as laytime or time on demurrage.~~
~~On request the Owners shall provide free of charge cranemen/winchmen from the crew to operate the Vessel's cargo handling gear, unless local regulations prohibit this, in which latter event~~ shore labourers shall be for the account of the Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants but shall always work under the supervision of the Master.
(c) Stevedore Damage
~~The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores' written acknowledgement of liability.~~
~~The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness or class before the Vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any time lost shall be for the account of and shall be paid to the Owners by the Charterers at the demurrage rate.~~ See Clauses 35

6. Laytime
~~(a) Separate laytime for loading and discharging~~
~~The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.~~
~~The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.~~
~~(b) Total laytime for loading and discharging~~
~~The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.~~
~~(c) Commencement of laytime (loading and discharging)~~
~~Laytime for loading and discharging shall commence at 13.00 hours, if notice of readiness is given up to and including 12.00 hours, and at 06.00 hours next working day if notice given during office hours after 12.00 hours. Notice of readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19.~~
~~If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/discharging berth shall not count as laytime.~~
~~If, after inspection, the Vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime.~~
~~Time used before commencement of laytime shall count.~~
~~* Indicate alternative (a) or (b) as agreed, in Box 16.~~ See Clause 26 & 27

7. Demurrage
Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. ~~Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice.~~
~~In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.~~

8. Lien Clause
The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight due under this Charter Party, deadfreight, and demurrage.

9. Cancelling Clause
(a) Should the Vessel not be ready to load (whether in berth or not) on the cancelling date indicated in Box 21, the Charterers shall have the option of cancelling this voyage Charter Party.
(b) Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers require a substitute vessel or if possible will exercise their option of cancelling the voyage ~~Charter Party,~~ or agree to a new cancelling date.
Such option must be declared by the Charterers within 24 running hours ~~48 running hours~~ after the receipt of the Owners' notice. ~~If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date.~~
~~The provisions of sub-clause (b) of this Clause shall operate only once, and in case of the Vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause (a) of this Clause.~~

10. Bills of Lading
Bills of Lading shall be presented and signed by the Master or his Agent as per the "Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter Party, or by the Owners' agents provided written authority has been given ~~by Owners to the agents, a copy of which is to be furnished to the Charterers. The Charterers shall indemnify the Owners against all consequences or liabilities that may arise from the signing of bills of lading as presented to the extent that the terms or contents of such bills of lading impose or result in the imposition of more onerous liabilities upon the Owners than those assumed by the Owners under this Charter Party.~~ See Clause 34

11. Both-to-Blame Collision Clause
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Owners in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Owners against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Owners. The foregoing provision shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

12. General Average and New Jason Clause
General Average shall be adjusted in London unless otherwise agreed in Box 22 according to York-Antwerp Rules 1994 and any subsequent modification thereof. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see Clause 2).
~~If General Average is to be adjusted in accordance with the law and practice of the United States of America, the following Clause shall apply: "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo shippers, consignees or the owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Owners before delivery."~~

13. Taxes and Dues Clause
~~(a) On Vessel - The Owners shall pay all dues, charges and taxes customarily levied on the Vessel, howsoever the amount thereof may be assessed.~~
~~(b) On cargo - The Charterers shall pay all dues, charges, duties and taxes customarily levied on the cargo, howsoever the amount thereof may be assessed.~~
~~(c) On freight - Unless otherwise agreed in Box 23, taxes levied on the freight shall be for the Charterers' account.~~ See Clause 35

COPY

PART II

"Gencon" Charter (As Revised 1922, 1976 and 1994)

14. Agency

In ~~every case the Owners shall appoint their own Agent both at the port of loading and the port of discharge.~~ See clause 23

15. Brokerage

A brokerage commission at the rate stated in Box 24 on the freight, dead-freight and demurrage earned is due to the party mentioned in Box 24.

In case of non-execution 1/3 of the brokerage on the estimated amount of freight to be paid by the party responsible for such non-execution to the Brokers as indemnity for the latter's expenses and work. In case of more voyages the amount of indemnity to be agreed.

16. General Strike Clause

(a) If there is a strike or lock-out affecting or preventing the actual loading of the cargo, or any part of it, when the Vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there, the Master or the Owners may ask the Charterers to declare, that they agree to reckon the laydays as if there were no strike or lock-out. Unless the Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, the Owners shall have the option of cancelling this Charter Party. If part cargo has already been loaded, the Owners must proceed with same, (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account.

(b) If there is a strike or lock-out affecting or preventing the actual discharging of the cargo on or after the Vessel's arrival at or off port of discharge and same has not been settled within 48 hours, the Charterers shall have the option of keeping the Vessel waiting until such strike or lock-out is at an end against paying half demurrage after the expiration of the time provided for discharging until the strike or lock-out terminates and thereafter full demurrage shall be payable until the completion of discharging, or of ordering the Vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this Charter Party and of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance to the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

(c) Except for the obligations described above, neither the Charterers nor the Owners shall be responsible for the consequences of any strikes or lock-outs preventing or affecting the actual loading or discharging of the cargo.

17. War Risks ("Voywar 1993")

For the purpose of Voywar 1993 it is always provided that war/warlike zone is declared by Lloyds of London Underwriters

(1) For the purpose of this Clause, the words:

(a) The "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all Vessels or imposed selectively against Vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

(3) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

(4) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(5) The Vessel shall have liberty:-

(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

(b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(e) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;

(f) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

18. General Ice Clause

*Port of loading*

(a) In the event of the loading port being inaccessible by reason of ice when the Vessel is ready to proceed from her last port or at any time during the voyage or on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the Master for fear of being frozen in is at liberty to leave without cargo, and this Charter Party shall be null and void.

(b) If during loading the Master, for fear of the Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for the Owners' benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter Party to be forwarded to destination at the Vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the Charterers, freight being paid on quantity delivered (in proportion if lumpsum), all other conditions as per this Charter Party.

(c) In case of more than one loading port, and if one or more of the ports are closed by ice, the Master or the Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for their own account as under section (b) or to declare the Charter Party null and void unless the Charterers agree to load full cargo at the open port.

*Port of discharge*

(a) Should ice prevent the Vessel from reaching port of discharge the Charterers shall have the option of keeping the Vessel waiting until the re-opening of navigation and paying demurrage or of ordering the Vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the impossibility of reaching port of destination.

(b) If during discharging the Master for fear of the Vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge.

(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

19. Law And Arbitration

(a) This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party and the arbitrators so appointed shall appoint a third arbitrator, the decision of the three-man tribunal thus constituted or any two of them, shall be final. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall be final.

For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association.

~~* (b) This Charter Party shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.~~

~~For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators Inc.~~

~~* (c) Any dispute arising out of this Charter Party shall be referred to arbitration at the place indicated in Box 25, subject to the procedures applicable there. The laws of the place indicated in Box 25 shall govern this Charter Party.~~

~~(d) If Box 25 in Part I is not filled in, sub-clause (a) of this Clause~~ shall apply.

~~* (a), (b) and (c) are alternatives; indicate alternative agreed in Box 25.~~

~~** Where no figure is supplied in Box 25 in Part I, this provision only shall be void but the other provisions of this Clause shall have full force and remain in effect.~~

BMI

COPY

ADDITIONAL CLAUSES TO CHARTER PARTY MV "GEM OF COCHIN"
CEMENT CLINKER IN BULK – NANTONG AND ZHOUSHAN / VALENCIA OR CARTAGENA
DATED IN MADRID 16th JULY 2008

**20. NOMINATION**

Deleted as not applicable.

**21. VESSEL DESCRIPTION**

Performing vessel to be Singledecker Bulkcarrier, maximum 26 years old, geared or gearless, and I.A.C.S.classiffied. ISM covered, fully P&I covered during the whole performance of this voyage. Vessel to comply with the I.S.P.S. regulations at both ends. OBO's are excluded.

Extra insurance owning to vessel age to be for Owner's account but max. US$ 20,000.- Extra insurance to be settle against underwriter's copy of the original invoice.

M/V "GEM OF COCHIN" (Ex "Theofano") – Panama Flag – Blt. 1982
64,975 mt DWAT on 12.78 m. SSW. (TPC: 65.20 MT)
7 Ho / Ha. of:
No.1) 16 x 12.80 m. / Nos.2 & 5) 18.1 x 12.80 m. / Nos.3,6 & 7) 18.70 x 12.80 m. / No.4) 11.90 x 12.80 m.
Abt. 2,672,028 cbft in main holds.
LOA: 227.997 M. / Beam: 32.20 m.
Class: B. V.
P&I: Britannia.
Port of Registry: Panama
Call Letters: 3EQC5

**22. FREIGHT PAYMENT**

95% of freight to be paid in U.S. Dollars directly into the Owner's bank and account within 5 days from signing and releasing Bills of Lading marked "Freight payable as per Charter Party", and Charterers receiving Owners faxed invoice, on Bills of Lading weight.

Freight deemed earned on shipment and non-returnable vessel and/or cargo lost or not lost.

Balance of freight plus Demurrage less Despatch Money to be settled after right and true delivery of the cargo and Owners presenting final freight invoice, together with N.O.R., Time Sheet and S.O.F. duly signed by Master and vessel's Agent.

Documentation and submission acceptable even by fax.

An irrevocable Letter of Credit in Owner's favour for 95% of freight to be issued by Charterers bank.

Should there be a case of dead freight than laytime to be calculated on the basis of the amount of freight charged.

Owners bank:

DANSKE BANK A/S - HOLMENS KANAL 2-12 - 1090 COPENHAGEN K. (DENMARK)
SWIFT ADD. : DABADKKK
USD ACCOUNT NO. : 3001 536656
USD IBAN NO. : DK27 3000 3001 536656
IN FAVOUR OF : ATLAS BULK SHIPPING A/S
REF. : MV "GEM OF COCHIN"



COPY

ADDITIONAL CLAUSES TO CHARTER PARTY MV "GEM OF COCHIN"
CEMENT CLINKER IN BULK – NANTONG AND ZHOUSHAN / VALENCIA OR CARTAGENA
DATED IN MADRID 16th JULY 2008

**22. (Continued)**
VIA CORRESPONDING US BANK:

BANK OF AMERICA N.A.,
NEW YORK BRANCH
U.S.A.
SWIFT ADD. : BOFAUS3N
IN FAVOUR OF : DANSKE BANK, COPENHAGEN
ACCOUNT NO. : 6550253668

**23.AGENCY.**

Owner's Agents at loading port to be nominated. Charterers' Agents at discharging port: Messrs. Marmedsa if Valencia, Messrs. Ership if Cartagena

Customary vessel's port charges and expenses including berthing and unberthing expenses to be for Owner's account and Owners to make their own financial arrangements regarding port expenses via agents. Owners to put agents in funds prior to vessel's departure at respective port, failing which Owners are to be responsible for any delay to vessel caused by Owners failure to place agents in funds prior to vessel's departure.

**24.OPENING AND CLOSING OF HATCHES**

Opening and closing of hatches, at loading and discharging ports, to be for Owners account and time, and performed by ship's crew, if allowed by port regulations. If port regulations do not permit opening and closing of hatches to be done by crew, same to be arranged by Charterers at their time and expense. Vessel's hatchcovers to be watertight.

**25.ETA NOTICES**

Owner/Master to give notices as follows:

On fixing plus 3, 2 and 1 day ETA loading port.
If berth is occupied Master can tender Notice of Readiness via radio or in writing or by cable or be letter whether in berth or not, whether in port or not, whether customs cleared or not and whether in free pratique or not.

For discharge: Master to advise ETA at discharge port on completion of loading and thereafter every 20/15/10/5/3/2/1 day(s).

Master/Owners to send ETA notices to: Respective Agents and Charterers via chartering@boxmarine.com

Master will cable Receivers, Charterers and Agents at Discharging Port on vessel's sailing from loading port stating: Cargo loaded according to B/L, sailing and estimated arrival draft, and ETA discharge port. Should, by any reason, this ETA be delayed or advanced by more than 24 hrs, Owners/Master to cable agents and receivers immediately advising said change.



COPY

ADDITIONAL CLAUSES TO CHARTER PARTY MV "GEM OF COCHIN"
CEMENT CLINKER IN BULK – NANTONG AND ZHOUSHAN / VALENCIA OR CARTAGENA
DATED IN MADRID 16th JULY 2008

26. LOADING TERMS

Loading rates will be 15,000 metric tons at 1st loading port and 10,000 metric tons at 2nd loading port, always per weather working day of 24 consecutive hours. Sundays and Holidays included, Laytime in 2nd loading port shall be reversible.

Time of shifting from anchorage to loading berth not to count, even if vessel is already on demurrage.

The cargo to be loaded, stowed and trimmed by shore and/or floating cranes free of risk and expenses to the vessel. In case any damage on vessels's facility, the discrepancy shall be amicable solved between port stevedores and Owners directly, free of risk and expenses to the Shippers. However Shippers/Charterers to assist Owners in every possible way to collect outstandings from Stevedores.

At first loading port time to commence to count at 1 p.m. if NOR is tendered on or before noon, and at 6 a.m. of next day if NOR is tendered in the afternoon, unless loading sooner commenced WIBON. NOR shall be tendered shinc. At second loading port time to commence to count upon vessel arrival. At both loading ports WIPON,WIBON,WIFPON,WICON.

Laytime shall be terminated upon completion of actual loading.

Laytime shall not count when loading of cargo into vessel is prevented by adverse weather conditions unless vessel is already on demurrage.

27. UNLOADING TERMS.

Discharging rate will be 20,000 metric tons per weather working day of 24 consecutive hours, Sundays and Holidays included. Superholidays excluded.

Current Superholidays at discharging ports:

At Cartagena: 1st January, 16th July and 25th December.

At Valencia: 20:00 hrs. 31st December to 08:00 hrs. 2nd January, 6th January / 19th March, 16th July, 20:00 hrs. 24th December to 08:00 hrs. 26th December.

Notice of Readiness shall be tendered at any time day or night Sundays and Holidays included at the discharging port or its anchorage. Laytime to commence Twelve (12) hours after Notice of Readiness is tendered, whether in port or not, whether in berth or not, whether customs cleared or not and whether in free pratique or not, unless sooner worked. Time actually used before commencement of laytime shall count.

Master has the right to tender Notice of Readiness via cable/radio/telex whether in port or not, whether in berth or not, whether customs cleared or not and whether in free pratique or not.

If the determination of such turn time falls upon a period excluded, then time to commence to count at 08:00 hours a.m. on the next working day.

Time after a day excluded to commence to count at 08:00 hours a.m. on the next working day.

Time for shifting from anchorage to discharging berth not to count even if the vessel is already on demurrage.

Time for coast guard security clearance not to count as laytime.



COPY

ADDITIONAL CLAUSES TO CHARTER PARTY MV "GEM OF COCHIN"
CEMENT CLINKER IN BULK – NANTONG AND ZHOUSHAN / VALENCIA OR CARTAGENA
DATED IN MADRID 16th JULY 2008

**27. (Continued)**
If dock is available but port authorities refuse to enter the vessel due to bad weather, lack of visibility or any other physical reason regarding the safety of the vessel, crew or the port, any time lost waiting for port authorities approval for entering the port will not count as laytime.

Discharge time to cease upon completion of discharging cargo.

The cargo shall be taken from the holds by the Charterers/Receivers free of any risk, liability, expense to the vessel provided an officer from the crew is available to assist terminal for discharge procedure and supervision 24 hours a day. Master and crew to be fully cooperative in shifting/warping vessel alongside, reporting to Charterers/Agents information on load/discharge daily operations.

Other limitations / restrictions apart from draft at discharging port which is 14.50 m. SW guaranteed by Charterers, at Owners' risk.

**28. DEFAULT OF VESSEL READINESS**

If the vessel is inspected at anchorage or berth or if Notice of Readiness is tendered at an outside berth or after berthing and vessel fails inspection and found not to be ready in all respects to load or discharge, any actual time lost from the moment of the discovery thereof until she is in fact ready to load/discharge, shall not count as laytime.

**29. DEMURRAGE/DESPATCH**

Charterers to pay:
Demurrage, at the rate of USD. 55,000.- per day or pro rata, laytime lost both ends.
Owners to pay and allow despatch at half the demurrage rate on laytime saved both ends.

Laytime to be non-reversible between loading and discharging ports.

Time sheet calculations shall be based on the Statement of Facts issued by ship agent and countersigned by the Shippers/Receivers as well as Vessel's Master.

**30. HOLD CLEANLINESS AND CARGO DAMAGE**

Vessel must be in suitable condition in all respects to load commodity (clinker). Vessel's holds must be dry and clean, draft marks must be readable. Holds cleanliness survey to be performed by Independent Surveyor available at Nantong port mutually agreed. Free of any residue, rust scale, leakage may cause vessel to fail inspection. In this case, inspection will be renewed. Charterers will not be responsible for damage to sweat battens, trimming hatch covers or other objects if stored in such a way that they are exposed to contact with cargo, or to ladders and batten clips, removable or unremovable. Vessel's holds cleanliness is at Owners time and account.

Vessel's holds to be swept dry free of remainder or any previous cargo on tendering notice of readiness at load port. Any time spent cleaning holds to be for Owner's account. In case of dispute, Charterers and Owner will jointly appoint a surveyor who will decide on cleanliness. Holds to be watertight. Hatch covers, hatch coamings and any openings are to be in good condition and watertight to surveyors satisfaction who may carry out a Water Hose test if he considers same to be necessary.

Any damage to cargo in quality or substance due to contamination by previous unclean holds or infiltration of water throughout holds and/or hatches to be Vessel's responsibility, cargo quantity damaged to be determined by an independent surveyor and Owners to provide P&I CLUB guarantee for security of payment of damages immediately and prior to vessel sailing.



COPY

ADDITIONAL CLAUSES TO CHARTER PARTY MV "GEM OF COCHIN"
CEMENT CLINKER IN BULK – NANTONG AND ZHOUSHAN / VALENCIA OR CARTAGENA
DATED IN MADRID 16th JULY 2008

**30. (Continued)**
Shippers to arrange for hold inspection immediately upon vessel's tendering NOR whether in berth or at anchorage and vessel to be passed by surveyor before notice is accepted. In the event that it is not possible to arrange hold inspection immediately the Notice of Readiness to be accepted and vessel to be inspected at earliest opportunity and in the event she fails inspection then time from such failure until eventual passing not to count.

If there is a dispute in regard to cargo cleanliness a mutually appointed impartial surveyor should be invited to make the final decision. Time will not count during all time lost due to this reason, however, if Master/Owners are right, time to count.

31. <u>FINAL CLEANING</u>

Final trimming and shovel cleaning of holds as far as stevedores can reach standing on tanktop will be done concurrent with discharge and will be carried out for Charterers/Receivers time and expense. Remaining on board cargo per hold shall be as least as possible. Owners have the option to use shore labor to remove excess cargo at their cost with time used to count, during discharging and stevedores final cleaning operations, and stevedore's superintendent.

Vessel should have hull structure for easy cleaning with minimum coaming in holds.

Vessel to permit lowering of front-end unloader or small bulldozers with rubber tires for clean-up of holds.

32. <u>OWNERS RESPONSIBILITIES</u>

Owner shall hold harmless and indemnify the Charterers, their officers, employees or agents from any or all claims and expenses relating to the arrest, detention, confiscation or seizure of the vessel by any governmental authority in any country for any reason relating directly or indirectly to the smuggling or illicit trafficking of drugs by the Owner, disponent Owners, operators, Master, officers, employees or its agents. Owner, disponent Owner or operator agrees to pay/reimburse on demand to Charterers, their agents, officers, employees for any and all proven expenses and fees, including legal fees incurred in connection with any action taken by Charterers, their agents, officers, employees in the defence of any such claim referred to above.

Nominated vessels to be classed highest Lloyd or equivalent, possess valid ITF Certificate or equivalent, oil pollution certificate of responsibility and all and any other certificates to enable the vessels enter loading and discharging ports. During the course of this agreement Owners shall, for their sole account, comply with all environmental laws, including without limitation Compensation and Liability Act of 1980, and the Civil Liability Convention and all present and future amendments thereto.

It is the Captain's responsibility to have on board the necessary documentation for navigation, approaching loading and discharge ports, as well as complete and correct immigration documents for him and crew. 32.

Any time lost due to incomplete documentation of vessel and/or crew or any fine submitted therefore, will be for Owner's account.

Owners will ensure that accurate up-to-date deadweight scale, trim data, fuel and ballast tanks tables are on board and available to the surveyor to facilitate calculation of cargo weights. The Captain of the vessel will always give Shippers and receivers before arriving loading and discharge ports a loading or discharge plan, including number of movements, and to be settled prior to loading and/or discharging operations.



COPY

ADDITIONAL CLAUSES TO CHARTER PARTY MV "GEM OF COCHIN"
CEMENT CLINKER IN BULK – NANTONG AND ZHOUSHAN / VALENCIA OR CARTAGENA
DATED IN MADRID 16th JULY 2008

**32. (Continued)**
Owner will ensure that all ship's tables and markings are correct and in all respects reliable to produce accurate weight measurements at both loading and unloading ports. Any expense by noncompliance of this requirement will be for Owners account.

Vessel to be equipped with light for night work, which is to be provided free of charge to Charterers whenever required. Opening and closing of hatches to be done at all times by vessel's crew, if permitted by local authorities, otherwise to be performed by shore hands for Charterers account.

Vessel's discharging system and all other equipment should comply with the regulations of the countries in which vessel will be employed. The owner is to ensure that vessel is at all times in possession of valid up to date certificates of efficiency to comply with such regulations. If stevedores, longshoremen, or other workers are not permitted to work due to failure of Master to comply with the aforementioned regulations or because Vessel is not in possession of such valid and up to date certificates then time not to count as lay time and Owners to pay all related proven expenses incurred incidental to and resulting from such failure.

Vessel to supply valid deratization certificate.

Owner/Master will cooperate with Charterer at load port in arranging cargo stowage plan to facilitate efficient discharge and clean out.

Owners to satisfy themselves with restrictions at all ports.

Due to atmospheric and climatic occurrences, port conditions might change, therefore Owners to satisfy themselves that their vessels will be able to safely enter the port including all approaches and safely berth at the appointed berth. Charterers will endeavor and provide Owners with port information as available but without guarantee.

33.. BILL OF LADING

Bill of Lading weight shall be determined by means of reading the vessel's draft at loading port by independent surveyor and Master and/or Chief officer.

Owners and or Master to authorize Agents at the loading port to sign and release Bills of Lading on their behalf.

If there will be no original Bills of Lading presented to Master on vessel's arrival to discharging port cargo to be released against Letter of Indemnity signed by the receivers and Charterers. Letter of indemnity to be in Owners P and I form.

End user will use original Bills of Lading or 1st class bankers guarantee to discharge cargo.

34. STEVEDORE DAMAGE

Stevedore damages given to vessel by stevedores to be settled between stevedores and Owners directly. However Charterers will do their utmost to assist Owners to obtain a settlement with stevedores.

Written notice of damages shall be given to the Stevedores Company, at the time such damage occurs at the loading and discharging ports, or at the earliest opportunity within 24 hours after damage occurred.

Proved damages to be repaired by the stevedores without intervention of the Charterers, Shippers or Receivers. If Owners not able to obtain satisfaction from stevedore, Charterers will do their utmost to assist Owners in obtaining proper settlement from stevedores.

6

COPY

ADDITIONAL CLAUSES TO CHARTER PARTY MV "GEM OF COCHIN"
CEMENT CLINKER IN BULK – NANTONG AND ZHOUSHAN / VALENCIA OR CARTAGENA
DATED IN MADRID 16th JULY 2008

35. TAX CLAUSE.

All taxes and/or dues on cgo and/or freight, including T-3 taxes at port of disch to be for Charterer's account, however all taxes, dues on vessel whether assessed directly or based on the volume of cargo loaded, including all charges falling under customary port charges to be for Owner's account.

36. This agreement and all disputes and claims arising out of or in connection with them, will be governed by, and construed in accordance with English law.

Any dispute arising out of or in connection with this agreement, including any question regarding its existence validity or termination shall be referred to and finally resolved by Arbitration held in London, England, under the rules or arbitration of the International Chamber of Commerce (which rules are deemed to be incorporated by reference into this Clause) by three arbitrators appointed in accordance with the said rules. The arbitration tribunal shall be binding on the parties. Each party expressly waives its right to any form of appeal or recourse from such arbitral proceedings to a court of law or other judicial authority.

BIMCO STANDARD LAW & ARBITRATION CLAUSE 1998
ENGLISH LAW, LONDON ARBITRATION

This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of U.S. $ 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

37. ADDITIONAL CLAUSES

New Jason Clause, P & I Bunkering Clause, New Both to Blame Collision Clause, The Hague-Visby rules, General clause Paramount, deemed to form part of this Charter Party.

COPY

ADDITIONAL CLAUSES TO CHARTER PARTY MV "GEM OF COCHIN"
CEMENT CLINKER IN BULK – NANTONG AND ZHOUSHAN / VALENCIA OR CARTAGENA
DATED IN MADRID 16th JULY 2008

**38. FORCE MAJEURE**

Neither party hereto shall be liable for loss to the other party hereto in the case the party concerned is unable to fulfill the whole or any part of its obligations hereunder or is prevented from or delayed in fulfilling such obligations owing to Act of God or any other reason beyond the control of the party concerned, such as any act of national or local government or any agency thereof, voluntary or involuntary compliance with mandatory rules, regulations or others (including priority request or order) off any government authority or any agency department, officers or instrumentality thereof, political disturbances, intervention of sanitary, customs and /or other constituted authorities, partial or total stoppage on rivers, earthquake, epidemics, quarantine, explosion, act of public and foreign enemies, insurrection, rebellion, tumults, civil commotions, aleatory usurpation of power, riot, war, warlike situations, hostilities (whether war be declared or not), embargo, sabotage, invasion which would affect the working, carriage, delivery, shipment, transfer or discharge of the sold cargo form Shippers' facilities, vessels loading, or shifting from transfer point to Receivers terminals whether this is partial or general, whether similar to the foregoing or not; or accidents at the factories, at receivers work or wharf, landships, etc.

Should any of the events referred to in the preceding paragraph occur, the party whose performance is affected shall give notice to the other party as promptly as practicable of the nature, probable duration and the express cause of such prevention from or suspension of or delay in its performance and shall use due diligence to resume full performance of its obligations at the earliest practicable date.

Should any event of those referred to above continue for a period exceeding one (1) week, either party may, at its option, terminate the settlement in question, in which case neither party may claim damage for performance.

In the event of outbreak of war involving China or any of the major powers or in the event of war or warlike situation in the countries where loading or discharging occurs, Owners or Charterers shall have the right to cancel this voyage. For the purpose of this Clause, the terms "major powers" shall be deemed to include but not excluding the U.S.A., Russia, Great Britain, France, Germany, Norway, Spain, Italy, Turkey, Egypt.

**39. ISM OBLIGATION**

BIMCO ISM Clause to apply

**40. Water Tightness of Holds and Openings**

Irrespective of Owners to warrant holds, all hatches and any access to holds are watertight. Any damage Caused by water ingress due to vessel's deficiencies to be for Owner's account provided it is not caused by the default of charterers.

**41. Vessel's Service / Overtime**

The ship to work overtime, if requested to do so, all extra expenses incurred thereby to be paid by party ordering same, except Officers and crew's overtime which is always to be for Owners' account. Master shall maintain and provide free use of vessel's electric lighting onboard (owners can supply geared lights only), if required for night work. Overtime if ordered by port authority(ies) the same to be shared equally.

Vessel's crew to open and close hatches as required during loading / discharging operations provided same is not prohibited by local regulations.



COPY

ADDITIONAL CLAUSES TO CHARTER PARTY MV "GEM OF COCHIN"
CEMENT CLINKER IN BULK – NANTONG AND ZHOUSHAN / VALENCIA OR CARTAGENA
DATED IN MADRID 16th JULY 2008

41. (Continued)
Vessel to move up and down at loading and/or discharging berth to facilitate proper loading and/or discharging. Owners agree that the vessel is willing to warp alongside Shippers' / Receivers' quay during loading / discharging operation.

Master / Owners to also advise Charterers' berthing / loading / discharging prospects on arrival of vessel at load and discharge ports and also to keep all concerned regularly informed of loading / discharging status / progress.

Master at sea every 48 hours to report vessel's noon position, weather conditions and ETA discharge port to agent and to charterers by e-mail.

42. <u>Owner's P. and I.</u>

Owners guarantee that the vessel is entered for full cover and shall remain entered for the duration of this C/P with a recognized Protection and Indemnity Association.

43. <u>Vessels' Insurance</u>

Owners guarantee that vessel is fully H+M insured and will remain so for the duration of this C/P.

44. <u>SHIFTINGS CLAUSE</u>

The first shifting from the anchorage to loading and or waiting berth at load port and from the anchorage to discharging or waiting berth at discharging port to be Owners account and time not to count even if the vessel is already on demurrage – i.e. time/operation used for first berthing at each port.

However if any other further shiftings at load and/or discharging port same to be fully for Charterers account and time to count.

Warping alongside berths, if any, to be for Owner's account.

45. Master to issue and deliver clean on board and freight payable as per Charter Party Bill of Ladings. If the cargo is wet and/or mixed with foreign materials, Owners/Master have the right to refuse loading of such cargo and shippers are obliged to bring dry and clean cargo to the vessel.

<u>THE CHARTERERS</u> <u>THE OWNERS</u>

# EXHIBIT 2

Atlas Bulk Shipping A/S
11, Sundkaj
2100 Copenhagen
Denmark

tel: +45 3927 9400
fax: +45 3927 9402
telex: 22200 atlas dk

sanmax@atlas-shipping.com
www.atlas-shipping.com

Cementos Castilla la Mancha, S.A

Ctra. CM 2102, Km. 1
16440 Montalbo, Cuenca
Spain

Date 28. July 2008
No Draft

# Freight Invoice

**M/V GEM OF COCHIN - C/P 16 July 2008**

| | USD |
|---|---|
| Freight: | |
| 45.305,5000 mt clinker at USD 51,500 | 2.333.233,25 |
| 17.288,0000 mt clinker at USD 51,500 | 890.332,00 |
| Less 5 % balance freight | (161.178,26) |
| **Balance in Owners favour** | **3.062.386,99** |

E.& O.E.

---

## Remittance details

We ask you kindly to transfer above balance with value 30 July 2008 to:

Danske Bank
Holmens Kanal 2,
DK-1090 Copenhagen K,
Denmark
Swift Code: DABADKKK
Bank Branch No: Holmens Kanal Afd
Account No: 3000 3001 536656
Iban No: DK27 3000 3001 536656
Beneficiary: Atlas Bulk Shipping A/S
Corresponding bank: Bank of America N.Y. - SWIFT: BOFAUS3N

Reference: GEM OF COCHIN - Com Ati - F00424 - Client 2004

Yours faithfully
Atlas Bulk Shipping A/S
Kevin Bergenser

Page 2

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

ATLAS BULK SHIPPING AS,

Plaintiff,

- against -                                                    ECF Case

CEMENTOS CASTILLA LA MANCHA, S.A.

Defendant.

---------------------------------------------------------------X

**AFFIDAVIT IN SUPPORT OF PRAYER FOR MARITIME ATTACHMENT**

State of Connecticut )
) ss: SOUTHPORT
County of Fairfield )

Patrick F. Lennon, being duly sworn, deposes and says:

1. I am a member of the Bar of this Court and represent the Plaintiff herein. I am familiar with the facts of this case and make this Affidavit in support of Plaintiff's prayer for the issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the Supplemental Admiralty Rules of the Federal Rules of Civil Procedure.

**DEFENDANT IS NOT PRESENT IN THE DISTRICT**

2. I have attempted to locate the Defendant, CEMENTOS CASTILL LA MANCHA, S.A., within this District. As part of my investigation to locate the Defendant within this District, I checked the telephone company information directory, as well as the white and yellow pages for New York listed on the Internet or World Wide Web, and did not find any listing for the Defendant. Finally, I checked the New York State Department of Corporations' online database which showed no listings or registration for the Defendant.

3. I submit based on the foregoing that the Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

4. Upon information and belief, the Defendant has, or will have during the pendency of this action, tangible and intangible property within this District and subject to the jurisdiction of this Court, held in the hands of in the hands of garnishees within this District, which are believed to be due and owing to the Defendant.

5. This is Plaintiff's first request for this relief made to any Court.

**PRAYER FOR RELIEF FOR ORDER ALLOWING SPECIAL PROCESS SERVER**

6. Plaintiff seeks an Order pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, for an Order appointing Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy R. Peterson, Coleen A. McEvoy, Anne C. LeVasseur or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, or any process server employed by Gotham Process Servers, in addition to the United States Marshal, to serve the Ex Parte Order and Process of Maritime Attachment and Garnishment, together with any interrogatories, upon the garnishee(s), together with any other garnishee(s) who (based upon information developed subsequent hereto by the Plaintiff) may hold property of, for or on account of, the Defendant.

7. Plaintiff seeks to serve the prayed for Process of Maritime Attachment and Garnishment with all deliberate speed so that it may be fully protected against the potential of being unable to satisfy a judgment/award ultimately obtained by Plaintiff and entered against the Defendant.

8. To the extent that this application for an Order appointing a special process server with respect to this attachment and garnishment does not involve a restraint of physical property, there is no need to require that the service be effected by the Marshal as it involves simple delivery of the Process of Maritime Attachment and Garnishment to the various garnishees to be identified in the writ.

**PRAYER FOR RELIEF TO SERVE LATER IDENTIFIED GARNISHEES**

9. Plaintiff also respectfully requests that the Court grant it leave to serve any additional garnishee(s) who may, upon information and belief obtained in the course of this litigation, to be holding, or believed to be holding, property of the Defendant, within this District. Obtaining leave of Court at this time to serve any later identified garnishees will allow for prompt service of the Process of Maritime Attachment and Garnishment without the need to present to the Court amended Process seeking simply to identify other garnishee(s).

**PRAYER FOR RELIEF TO DEEM SERVICE CONTINUOUS**

10. Further, in order to avoid the need to physically serve the garnishees/banks daily and repetitively, Plaintiff respectfully seeks further leave of the Court, as set out in the accompanying Ex Parte Order for Process of Maritime Attachment, for any process that is served on a garnishee to be deemed effective and continuous service throughout the remainder of the day upon which service is made commencing from the time of such service; and such service to be further deemed effective through the end of the next business day, provided that another service is made that day, and to authorize service of process via facsimile or e-mail following initial *in personam* service.

Dated: August 12, 2008
Southport, CT

Patrick F. Lennon

Sworn and subscribed to before me
this 12th day of August, 2008

Notary Public